ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of -- )
)
Exelis Inc. ) ASBCA No. 58966
)
Under Contract No. W911SR-04-C-0100 )

APPEARANCES FOR THE APPELLANT:　　Steven M. Masiello, Esq.
　　　　　　　　　　　　　　　　　Kelly P. Garehime, Esq.
　　　　　　　　　　　　　　　　　Christopher W. Myers, Esq.
　　　　　　　　　　　　　　　　　Joshua D. Prentice, Esq.
　　　　　　　　　　　　　　　　　　Dentons US LLP
　　　　　　　　　　　　　　　　　　Denver, CO

APPEARANCE FOR THE GOVERNMENT:　　E. Michael Chiaparas, Esq.
　　　　　　　　　　　　　　　　　DCMA Chief Trial Attorney
　　　　　　　　　　　　　　　　　Defense Contract Management Agency
　　　　　　　　　　　　　　　　　Chantilly, VA

OPINION BY ADMINISTRATIVE JUDGE SWEET

This is an appeal of a contracting officer's final decision that appellant Exelis Inc. included unallowable and expressly unallowable costs in a certified indirect cost proposal.[1] Pursuant to Board Rule 11, the parties elected to waive a hearing and to submit the appeal on the record before the Board. We deny the appeal.

FINDINGS OF FACT

*I. Exelis's Total Shareholder Return Plan*

1. During the relevant period, Exelis[2] was an intermediate home office. It provided services to subordinate segments that performed government contracts. (Compl. ¶ 1) Exelis allocated its costs to the business segments as indirect costs (R4, tab 14 at G-185).

---

[1] Contract No. W911SR-04-C-0100 is a representative contract (gov't br. at 11).

[2] Prior to 2006, Exelis was part of ITT Industries Incorporated. In 2006, ITT Industries Incorporated changed its name to ITT Corporation. At the time, ITT Corporation consisted of three business segments: Fluid & Technology, Defense Electronics & Services, and Motion & Flow Control. In 2011, ITT Corporation split into three independently traded companies. Exelis is the former Defense Electronics & Services intermediate home office. (Compl. ¶ 1) This opinion refers to Exelis and its predecessors the Defense Electronics & Services intermediate home office of ITT Corporation and ITT Industries, Incorporated as Exelis.

2. Exelis's compensation for its executives included a Long-Term Incentive Plan (LTIP) (supp. R4, tab 18 at G-201). The LTIP consisted of three types of compensation: restricted shares, stock options, and total shareholder return (TSR) (R4, tab 1 at G-3). Exelis used a four-step process to calculate the amount of TSR it would pay to an executive (R4, tab 5 at G-64-65).

3. First, Exelis established payout factors. The payout factors were predetermined percentages of Exelis's TSR performance rating relative to the TSR performance rating of its peers, which determined the amount of a target award that an executive was eligible to receive. When Exelis's TSR performance rating was between 0% and 35% of its peers' ratings, the payout factor was 0% of the target award pool. When Exelis's TSR performance rating was between 36% and 50% of its peers' ratings, the payout factor was 50% of the target award pool. When Exelis's TSR performance rating was between 51% and 80% of its peers' ratings, the payout factor was 100% of the target award pool. When Exelis's TSR performance rating was between 81% and 100% of its peers' ratings, the payout factor was 200% of the target award pool. (R4, tab 5 at G-65)

4. Second, on an annual basis, Exelis's compensation committee determined the fixed target award pool (R4, tab 5 at G-65).

5. Third, Exelis had Morgan Stanley determine Exelis's TSR performance rating relative to its peers (R4, tab 5 at G-66). Morgan Stanley calculated TSR performance ratings as follows:

$$(\text{Company Stock Price}_{end} - \text{Company Stock Price}_{beginning} + \text{Dividends paid})/ \text{Company Stock Price}_{beginning}$$

(*Id.*) Morgan Stanley then ranked all the peer companies in descending order based upon their TSR performance rating. Thus, the TSR performance rating was based upon changes in corporate securities price and dividend payouts. (*Id.*)

6. Fourth, Exelis calculated its TSR compensation payout. Exelis used the relative TSR performance rating from step three to determine the payout factors established in step one. Exelis then applied the payout factor to the TSR target award from step two to calculate the actual TSR compensation payout to an executive. Because the TSR compensation was based upon the TSR performance rating, which in turn was based on securities price changes and dividend payouts, the TSR compensation payout was based on securities price changes and dividend payouts. (R4, tab 5 at G-66-67)

7. Exelis measured its performance relative to its peers over a three-year period. It paid the TSR compensation in cash. (R4, tab 5 at G-65-66)

2

8. The TSR compensation payout relevant to this appeal is the 2004 TSR compensation payout, which covered the period from 1 January 2004 through 31 December 2006. For that period, Exelis's TSR performance rating was 58.6%, which ranked 111th among 324 peer companies. (Supp. R4, tab 41 at G-462) That resulted in a relative TSR performance rating of 65.74% of the peers. Therefore, the final performance factor was 152.469% of target. As a result, Exelis paid 51 executives TSR compensation on 19 January 2007. (Supp. R4, tab 41 at G-459)

II. *Defense Contract Management Agency's Review of Exelis's Long-Term Incentive Plan Costs*

9. Exelis submitted to the Defense Contract Management Agency (DCMA)[3] indirect cost proposals for each fiscal year (FY), including for FY 2004, FY 2005, and FY 2006 (supp. R4, tabs 38, 45, 47).

10. In 2006, the Defense Contract Audit Agency (DCAA) audited Exelis's FY 2004 indirect cost proposal (2006 audit). The DCAA reported the results of the 2006 audit to DCMA corporate administrative contracting officer (CACO) Diana Rivera in Audit Report No. 6321-2004G10100002. The 2006 audit found that the executive compensation costs were unallowable, and a penalty should be imposed, because those costs exceeded the executive compensation cap in Federal Acquisition Regulation (FAR) 31.205-6(p). The 2006 audit made no findings regarding the allowability of the TSR compensation costs under FAR 31.205-6(i). There was no evidence before the DCAA of how Exelis calculated the TSR compensation. (Supp. R4, tab 38 at G-433)

11. In 2007, the DCAA audited Exelis's FY 2005 indirect cost proposal (2007 audit). The DCAA reported the results of the 2007 audit to CACO Rivera in Audit Report No. 6321-2005G10100002. Similar to the 2006 audit, the 2007 audit found that executive compensation costs were unallowable, and a penalty should be imposed, because those costs exceed the executive compensation cap in FAR 31.205-6(p). The 2007 audit made no findings regarding the allowability of the TSR compensation costs under FAR 31.205-6(i). There was no evidence of how Exelis calculated the TSR compensation before the DCAA. (Supp. R4, tab 45 at G-508)

12. On 28 June 2007, Exelis objected to the findings in the 2006 and 2007 audits. It argued that FAR 31.205-6(p) only caps executive wages, salary, bonuses, and deferred compensation. Exelis further argued that, because the TSR was an incentive plan, and not deferred compensation, it was allowable under FAR 31.205-6(p). Exelis did not assert that a penalty was inappropriate because the FY 2004 and FY 2005 indirect cost proposals were not final indirect cost rate proposals. (Supp. R4, tab 46 at G-531)

---

[3] At the time, the DCMA was called the Defense Contract Management Command.

13. On 20 July 2007, Exelis submitted its FY 2006 indirect cost proposal. The 2006 indirect cost proposal stated that "[i]n accordance with FAR 52.216-7(d)(2)(i), please find attached [Exelis]'s 2006 Incurred Cost Submission. This submission represents [Exelis]'s final indirect cost proposal for our corporate office located in White Plains, NY." (Supp. R4, tab 47 at G-538)

14. The 2006 indirect cost proposal also contained the following certification:

**Certificate of Final Indirect Costs**

....

1. All costs included in this proposal, dated July 20, 2007 (extended from June 30, 2007) to establish a final indirect cost allocation for January 1, 2006 to December 31, 2006 are allowable in accordance with the cost principles of the Federal Acquisition Regulation (FAR) and its supplements applicable to the contracts to which the final indirect cost allocation will apply; and
2. This proposal does not include any costs which are expressly unallowable under applicable cost principles of the FAR or its supplements.

(Supp. R4, tab 47 at G-539) Thus, the 2006 indirect cost proposal was part of a final indirect cost rate proposal (*id.* at G-538-39).

15. The 2006 indirect cost proposal included TSR compensation costs in the allowable cost pool (app. supp. R4, tab 242 at ex-739-40).

16. On 31 July 2007, CACO Rivera sent an email to Exelis's Deirdre Bond. In that email, CACO Rivera stated that, "I have gotten a response from my legal and their bottom line is that Long Term Incentive Plan documentation submitted by [Exelis] indicates that the costs of this incentive program are expressly unallowable under FAR 31.205-6(i)." The email concluded that "[s]ince the amount of the incentive payment is calculated based on [Exelis's] dividend payments it is unallowable under [FAR 31.205-6(i)] and need not be considered under FAR 31.205-6(p). Limitation on allowability of compensation for certain contractor personnel, provision for senior executive compensation limitations." (Supp. R4, tab 48 at G-540)

17. Both CACO Rivera and Ms. Bond understood that the 31 July 2007 email indicated that the legal department believed that it was appropriate to analyze the allowability of the TSR compensation costs under FAR 31.205-6(i) instead of FAR 31.205-6(p) (supp. R4, tab 129 at G-1688, tab 131 at G-1824).

4

18. On 2 August 2007, CACO Rivera requested that the DCAA audit the 2006 indirect cost proposal (supp. R4, tab 49 at G-541).

19. In April 2008, Joseph Daniel, Exelis's assistant controller, disputed that TSR compensation costs were unallowable under FAR 31.205-6(i) (supp. R4, tabs 54, 57). Mr. Daniel asserted that "[a]lthough corporate securities are used in measuring company performance, the LTIP compensation is not set by the changes in the price or value of corporate securities" (supp. R4, tab 54 at G-584). Mr. Daniel also outlined the process for calculating TSR compensation (*id.* at G-586-88).

20. By email dated 7 August 2008, CACO Rivera responded to Mr. Daniel that, "[a]s we discussed, the Government [has] decided that the FAR 31.205-6(i) is not appropriate for several reasons and are simply citing the FAR 31.205-6(p) issue, as identified in the audit report" (supp. R4, tab 57 at G-615).

21. By letter dated 20 August 2008, Mr. Daniel responded to the 7 August 2008 email. Mr. Daniel agreed that TSR compensation costs are subject to the FAR 31.205-6(p) executive compensation cap. Mr. Daniel indicated that Exelis revised its FY 2004 indirect cost proposal, and requested a waiver of the penalty. (Supp. R4, tab 56 at G-612-13)

22. On 10 August 2009, CACO Rivera issued a contracting officer's final decision (COFD), assessing a penalty for including TSR compensation costs in excess of the FAR 31.205-6(p) executive compensation cap in its FY 2004 indirect cost proposal (supp. R4, tab 61 at G-645).

23. Exelis accepted the COFD, and paid the penalty. It did not assert that a penalty was inappropriate because the FY 2004 indirect cost proposal was not a final indirect cost rate proposal. (Supp. R4, tab 62)

24. On 17 September 2009, CACO Rivera sent Mr. Daniel a notice of intent to assess penalties for including TSR compensation costs in excess of the FAR 31.205-6(p) executive compensation cap in its FY 2005 indirect cost proposal (supp. R4, tab 63 at G-653).

25. Mr. Daniel responded that the TSR compensation costs were not subject to FAR 31.205-6(p) because they were part of an incentive plan, and not deferred compensation. Mr. Daniel did not assert that a penalty was inappropriate because the FY 2005 indirect cost proposal was not a final indirect cost rate proposal. (Supp. R4, tab 46 at G-531, tab 64 at G-655-56)

26. At CACO Rivera's request, the DCAA reviewed Exelis's response (supp. R4, tab 67 at G-663). In conducting that review, the DCAA requested that Mr. Daniel submit information on the TSR plan for FY 2005. In response, Mr. Daniel provided a brochure describing the TSR plan on 7 March 2011. (Supp. R4, tab 67 at G-664; *see also* R4, tab 1)

27. Based upon its review of the brochure, the DCAA determined in a 12 April 2011 audit (2011 audit), that the TSR compensation costs were expressly unallowable and subject to penalties under FAR 31.205-6(i). The DCAA reasoned that the TSR compensation "costs represent compensation costs based entirely on the changes in prices of corporate securities or corporate security ownership, including potential dividend amounts in direct violation of the FAR." (Supp. R4, tab 67 at G-664-65)

28. In response to the 2011 audit, CACO Rivera sent Mr. Daniel a revised notice of intent to assess penalties for the FY 2005 indirect cost proposal. CACO Rivera stated that the DCAA revised its position after reviewing the 7 March 2011 brochure. CACO Rivera stated that, based upon the 7 March 2011 brochure, she had determined that the TSR compensation costs are expressly unallowable and subject to penalties under FAR 31.205-6(i). (Supp. R4, tab 68 at G-667)

29. Mr. Daniel responded that the TSR compensation costs were allowable under FAR 31.205-6(i). Mr. Daniel did not assert that a penalty was inappropriate because Exelis's FY 2005 indirect cost proposals was not a final indirect cost rate proposal. (Supp. R4, tabs 46, 69) CACO Rivera sought to obtain input from the DCAA on Mr. Daniel's response (supp. R4, tab 71).

30. Meanwhile, by 2012, the DCAA completed its audit of the 2006 indirect cost proposal (2012 audit). The DCAA reported the results of the 2012 audit to CACO Rivera in Audit Report No. 2211-2006U10100001. (R4, tab 2) That 2012 audit report questioned the allowability of the TSR compensation costs in the amount of $6,623,086 under FAR 31.205-6(i) because those costs were calculated based upon changes in the corporate securities prices and dividend payments. The 2012 audit report also found that a penalty should be imposed because the TSR compensation costs are expressly unallowable. (*Id.* at G-21)

31. Exelis objected to the 2012 audit report's findings regarding the allowability of the TSR compensation costs. However, it did not assert that the penalty was inappropriate because the 2006 indirect cost proposal was not a final indirect cost rate proposal. (R4, tab 5 at G-63-67)

III. *Other Contractors' Treatment of TSR Compensation Costs*

32. The government conducted a survey of government contractors regarding TSR compensation costs (app. supp. R4, tab 291 at ex-1534). Thirty-four contractors responded (*id.* at ex-1535). Based upon those survey results, the government determined that eleven contractors had TSR plans similar to Exelis's TSR plan (*id.* at ex-1564-65).

33. Of those eleven contractors with similar TSR plans, six contractors did not include the TSR compensation costs in their cost submissions, and the government could

not determine how one other contractor treated the costs.[4] Four of the eleven contractors with similar TSR plans included TSR compensation costs in their cost submissions. The government challenged three of those four companies (Raytheon, Exelis, and another contractor). (App. supp. R4, tab 291 at ex-1564-65) It reached a pre-COFD settlement with the fourth company (other contractor settlement). The other contractor settlement stated that the parties were not agreeing on the allowability or unallowability of any costs. (*Id.* at ex-1582) However, after that settlement, the other contractor stopped including its TSR compensation costs in its cost submissions (*id.* at ex-1564-65).

## IV.    Entertainment Costs

34. On 2 December 2006, Exelis hosted a holiday party. It paid a band $7,050 to perform at the holiday party (entertainment costs). (Supp. R4, tabs 39-40)

35. The 2006 indirect cost proposal included the entertainment costs (app. supp. R4, tab 242 at ex-739-40).

36. In the 2012 audit, the DCAA questioned the allowability of the entertainment costs under FAR 31.205-14 because those were "costs of amusement." The 2012 audit also recommended a penalty because the costs were expressly unallowable. (R4, tab 2 at G-30-31)

37. In response, Exelis did not dispute that the entertainment costs were expressly unallowable. Rather, it argued that it inadvertently miscoded the costs, and that the amount was immaterial. However, it did not submit evidence to CACO Rivera that it had established policies, personnel training, and an internal control and review system that provide assurance that entertainment costs were precluded from being included in final indirect cost rate proposals. (R4, tab 5 at G-72)

## V.    Exelis's Policies and Training

38. As part of its supplemental Rule 4 filing, Exelis submitted the following documents purporting to show that it has established policies, personnel training, and an internal control and review system that provide assurance that entertainment costs are precluded from being included in final indirect cost rate proposals. None of that evidence had been provided to CACO Rivera. (App. supp. R4, tabs 211, 219, 235, 247-53)

39. First, Exelis submits its corporate policies, which have an effective date of 31 October 2011. The policy on allowable and unallowable costs indicates that Exelis

---

[4] One of the six contractors that did not include TSR compensation costs in its unallowable cost pool indicated that it intended to do so in the future. However, there is no evidence that that contractor followed through on that expressed intent. (App. supp. R4, tab 291 at ex-1564-65)

will segregate allowable and unallowable costs. In particular, the policy indicates that entertainment costs are unallowable. The policy states that, Exelis personnel review incurred costs to identify and segregate unallowable costs. Exelis conducts periodic and transactional reviews for appropriate classification. If that review identifies an unallowable cost, Exelis reclassifies and segregates that cost. The entertainment account is subject to 100% review. (App. supp. R4, tab 253 at ex-986-87) Other corporate policies cover cost allowability guidance for Exelis compliance agreements, time changing, corporate billing, cost accounting, government contracting issues, and purchasing (app. supp. R4, tabs 247-52).

40. Second, Exelis submits an ethics and compliance standard dated 16 June 2008 (app. supp. R4, tab 235).

41. Third, Exelis submits a code of corporate conduct dated July 2006. An appendix to the code states that Exelis must submit cost and pricing data correctly. However, the code does not mention entertainment costs or FAR 31.205-14, let alone provide assurance that entertainment costs are precluded from being included in Exelis's final indirect cost rate proposal. (App. supp. R4, tab 213 at ex-305)

42. Fourth, Exelis submits a presentation on allowability and allocability of home office G&A expenses dated February 2007. The presentation indicates that entertainment expenses are unallowable. However, the presentation does not provide assurance that entertainment costs are precluded from being included in Exelis's final indirect cost rate proposals. (App. supp. R4, tab 219)

43. Fifth, Exelis submits a presentation from June 2006 on current developments in government contracting. The presentation discusses changes in cost principles and cost accounting standards. It does not even mention entertainment costs or FAR 31.205-14, let alone provide assurance that entertainment costs are precluded from being included in Exelis's final indirect cost rate proposal. (App. supp. R4, tab 211)

44. In a survey dated 6 April 2011 (2011 survey), the DCAA indicated that Exelis has written policies and procedures to describe the identification and exclusion of unallowable costs (app. supp. R4, tab 238 at ex-691).

*VI. Contracting Officer's Final Decision and Procedural History*

45. On 19 July 2013, CACO Rivera issued a COFD on the questioned costs in the 2006 indirect cost proposal (R4, tab 15).

46. CACO Rivera found that the $3,628,272 in TSR compensation costs that Exelis included in its 2006 indirect cost proposal were unallowable under FAR 31.205-6(i). CACO Rivera reasoned that "[t]he LTIP is calculated based on changes in the prices of corporate securities and dividends. The LTIP is dependent on unallowable variables and there[fore] is unallowable." (R4, tab 15 at G-189-90)

8

47. CACO Rivera also found that $7,050 in entertainment costs in the 2006 indirect cost proposal were unallowable under FAR 31.205-14. CACO Rivera reasoned that those costs were for "amusement." (R4, tab 15 at G-189-90)

48. As a result, CACO Rivera ordered Exelis to remove the unallowable costs from the applicable indirect cost pools and from provisional and final billings for any open cost-type contracts for performance in calendar year 2006 (R4, tab 15 at G-189).

49. CACO Rivera also assessed a penalty because Exelis included expressly unallowable costs in its 2006 final indirect cost proposal. In particular, CACO Rivera found that the TSR compensation and entertainment costs were expressly unallowable under FAR 31.205-6(i) and FAR 31.205-14 respectively. (R4, tab 15 at G-190)

50. In assessing a penalty, CACO Rivera rejected Exelis's argument that the penalties for entertainment costs should be waived under FAR 42.709-5(c) on the grounds that it had inadvertently coded the costs. CACO Rivera reasoned that Exelis did not address the requirement under FAR 42.709-5(c) that a contractor demonstrate that it has established policies and personnel training, and an internal control and review system that provide assurance that unallowable costs subject to penalties are precluded from being included in the contractor's final indirect cost rate proposals. (R4, tab 15 at G-190-91)

51. Exelis filed a timely appeal of the COFD with the Board. The appeal was docketed as ASBCA No. 58966. Exelis seeks a declaration that the TSR compensation costs are allowable, that the TSR compensation costs are not expressly unallowable costs subject to penalties, and that any penalties for the entertainment costs must be waived under FAR 42.709-5(c). (Compl., Wherefore Clause) Pursuant to Board Rule 11, the parties elected to waive a hearing, and to submit the appeal on the record before the Board.

## DECISION

*I.    Exelis's TSR Compensation Costs are Unallowable under FAR 31.205-6(i)*

Exelis's TSR compensation costs are unallowable under FAR 31.205-6(i). Compensation for personal services generally is allowable, subject to certain exceptions. FAR 31.205-6(a). One of those exceptions is:

> (i) *Compensation based on changes in the prices of corporate securities or corporate security ownership, such as stock options, stock appreciation rights, phantom stock plans, and junior stock conversions.*

9

     (1) Any compensation which is calculated, or valued, based on changes in the price of corporate securities is unallowable.

     (2) Any compensation represented by dividend payments or which is calculated based on dividend payments is unallowable.

FAR 31.205-6(i). Executive compensation that is based upon a TSR formula that compares changes in a contractor's securities prices and dividends to those of its peers is unallowable under FAR 31.205-6(i). *Raytheon Co.*, ASBCA No. 57576 *et al.*, 15-1 BCA ¶ 36,043 at 176,054-55.

  Here, as in *Raytheon*, Exelis's TSR compensation costs were calculated, or valued, based upon securities price changes and dividend payments. As in *Raytheon*, the metric that Exelis used to calculate and value the TSR compensation was TSR performance ratings, which were based on securities price changes and dividend payments (findings 5-6). Indeed, the TSR performance rating formula was "(Company Stock Price $_{end}$ – Company Stock Price $_{beginning}$ + Dividends paid)/Company Stock Price $_{beginning}$" (finding 5). Therefore, the TSR compensation was an unallowable cost under FAR 31.205-6(i).

  Exelis argues that the TSR compensation costs are allowable because they are paid based upon a predetermined compensation award pool that is adjusted based on a payout factor determined by Exelis's rank amongst its peer. However, "in order to be unallowable the award...need not be solely dependent upon the change in price of...stock. Rather, the plain language of the cost principle more broadly renders unallowable any compensation that is 'calculated' or 'valued' based upon 'changes in the price of corporate securities.'" *Raytheon Co.*, 15-1 BCA ¶ 36,043 at 176,055 (citation omitted). Here, the method Exelis used to determine its rank amongst its peers for purposes of adjusting the award pool was to compare securities price changes and dividend payments (findings 3-6).

  Exelis also points to two hypothetical situations namely—where (1) there is no change in the price of Exelis's securities, but there is a TSR payment because the prices of the peers' securities fall; and (2) Exelis's securities price increases, but there is no TSR payment because the prices of the peers' securities increase more than that of Exelis. As an initial matter, those hypotheticals are beside the point. In this case, the price of Exelis's securities actually increased during the relevant period, and that resulted in TSR payments (finding 8).

  In any event, Exelis's hypotheticals merely highlight the fact that the TSR compensation is based upon a comparison of the securities price changes and dividend payments of Exelis and its peers. That does not change the fact that the TSR

compensation is based upon securities price changes and dividend payments. *Raytheon Co.*, 15-1 BCA ¶ 36,043 at 176,055 (holding that compensation is based upon securities price changes and dividend payments, even when the compensation is based upon securities price changes and dividend payments relative to a contractor's peers).

Nor does the fact that TSR compensation is not an example specifically enumerated in FAR 31.205-6(i) help Exelis. As Exelis concedes, the use of the phrase "such as" signifies that the listed examples are not exhaustive (app. br. at 20). *M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co.*, 439 F.3d 1335, 1342 (Fed. Cir. 2006). As discussed above, TSR compensation is similar to the enumerated examples because it is calculated, or valued, based upon securities price changes and dividend payments. *Raytheon Co.*, 15-1 BCA ¶ 36,043 at 176,055 (holding that the fact that FAR 31.205-6(i) gives examples does not negate the fact that TSR compensation is calculated or valued based on securities price changes and dividend payments).

In response to the government's citation to supplemental authority, Exelis argues that *Raytheon* is distinguishable because the compensation used in that case was stock instead of cash. As an initial matter, Exelis's belated attempt to distinguish *Raytheon*'s compensation scheme is inconsistent with its earlier admission that Raytheon's compensation scheme was "similar" to Exelis's compensation scheme (app. br. at 27; *see also* app. resp. at 13 (asserting that the compensation costs of other contractors, such as Raytheon, were "substantially similar, in fact essentially identical, to Exelis's TSR Award Costs")).

In any event, the fact that the compensation used in *Raytheon* was stock instead of cash is a distinction without a difference. FAR 31.205-6(i)(1) provides that "any compensation" which is calculated or valued based upon securities price changes or dividend payments are unallowable (emphasis added). The cost principles define compensation for personal services broadly to mean "all remuneration paid currently or accrued, in whatever form...for services rendered by employees to the contractor." FAR 31.001 (emphasis added). Thus, regardless of whether the form of the compensation is stock or cash, the costs of that compensation is unallowable under FAR 31.205-6(i) if it is calculated or valued based upon securities price changes or dividend payments.

Exelis argues that the distinction between stock and cash compensation makes a difference because the amount of compensation Raytheon paid varied in direct proportion to changes in securities prices, while Exelis caps the amount of compensation. However, FAR 31.205-6(i) does not require that the amount of compensation be directly proportional to the securities price changes, or that it be unlimited. On the contrary, as discussed above, the cost principle applies more broadly to any compensation that is calculated or valued based upon securities price changes or dividend payments. *Raytheon*, 15-1 BCA ¶ 36,043 at 176,055.

11

Exelis also points to the regulatory history of FAR 31.205-6(i). However, absent certain limited exceptions–which are not applicable here–we do not resort to regulatory history where, as here, the plain language of a regulation is unambiguous. *Ratzlaf v. United States*, 510 U.S. 135, 147-48 (1994); *Frederick v. Shinseki*, 684 F.3d 1263, 1275 (Fed. Cir. 2012).

In any event, even if we were to look at the regulatory history of FAR 31.205-6(i), it supports the conclusion that Exelis's TSR compensation costs are unallowable. The reason FAR 31.205-6(i) was promulgated was because the government "believes that incentive compensation must be clearly, logically, and demonstrably relatable to the employee's performance." *United Technologies Corp.*, ASBCA No. 49646, 00-1 BCA ¶ 30,729 at 151,796 (emphasis added). As the regulatory history indicates, the:

> Government has consistently held that compensation based on changes in securities prices is not compensation based on the work actually performed. There is no methodology available to determine what effect, if any, performance by an individual has on the price of stock. Many would argue that the general conditions in the stock markets are the most important factor in stock price movement. Others would point out that managers can influence the short term performance of stock prices by controlling (manipulating) the flow of information. In any case, the Government should not recognize any compensation based on stock price changes as an allowable cost.

(App. br., attach. A at 16-17) (Emphasis added) "Thus, the elements of change in security prices are either not costs (profit and dividends), are not allowable (interest), or are totally outside the control of a contractor (interest rates, public confidence in markets, and public expectations)" (*id*. at 17).

Exelis argues that its TSR compensation plan eliminates the elements of its securities price changes that are outside its control by comparing its securities price changes to those of its peers. Even if that were true, the TSR compensation still would not reflect the element of securities price changes attributable to an individual's effort. For example, the TSR compensation still would reflect securities price changes attributable to the flow of information, profits, dividends, or interest. The TSR compensation also would reflect the performance of Exelis generally relative to its peers, not the performance of the particular executive receiving the compensation. Therefore, the TSR compensation does not compensate an executive based upon the work he actually performed.

In sum, Exelis's TSR compensation costs are unallowable under FAR 31.205-6(i) because it is calculated, or valued, based upon securities price changes and dividend payments.

*II.    The Contracting Officer Properly Imposed a Penalty*

The contracting officer also properly imposed a penalty for including expressly unallowable costs in a proposal for settlement of indirect costs. FAR 52.216-7(d)(2)(i) requires a contractor to submit a final indirect cost rate proposal. "If the head of the agency determines that a cost submitted by a contractor in its proposal for settlement is expressly unallowable under a cost principal...that defines the allowability of specific selected costs, the head of the agency shall assess a penalty." 10 U.S.C. § 2324(b). FAR 42.709 implements 41 U.S.C. § 2324(b). It provides for "the assessment of penalties against contractors which include unallowable indirect costs in...[f]inal indirect cost rate proposals." *Id.*

Here, as discussed below, the penalty was appropriate because the TSR compensation and entertainment costs were expressly unallowable, and Exelis included those costs in a final indirect cost rate proposal. Moreover, a waiver of the penalty regarding entertainment costs is not required.

*A.    The TSR Compensation and Entertainment Costs are Expressly Unallowable*

The TSR compensation and entertainment costs are expressly unallowable. Not all unallowable costs are subject to penalty; they must be expressly unallowable in order to be subject to penalty. *Gen. Dynamics Corp.*, ASBCA No. 49372, 02-2 BCA ¶ 31,888 at 157,569. An expressly unallowable cost is "a particular item or type of cost which, under the express provisions of an applicable law, regulation, or contract, is specifically named and stated to be unallowable." FAR 31.001. To show that a cost is expressly unallowable, the government must establish that it was unreasonable under all the circumstances for a person in the contractor's position to conclude that the costs were allowable. *Gen. Dynamics Corp.*, 02-2 BCA ¶ 31,888 at 157,569.

Here, Exelis does not dispute that the entertainment costs are expressly unallowable. Moreover, we already have held that TSR compensation costs–such as those of Exelis–that are based upon a contractor's securities price changes and dividend payments relative to its peers are expressly unallowable. *Raytheon Co.*, 15-1 BCA ¶ 36,043 at 176,056. While the FAR does not specifically refer to "TSR," "subsection (i), is entitled in part: '*Compensation based on changes in the prices of corporate securities*,' and the TSR metric calculation clearly and unmistakably falls into that category." *Id.* at 176,054. Thus, "there can be no reasonable difference of opinion regarding these TSR costs. We believe it would be unreasonable under all circumstances to conclude that these costs were allowable." *Id.* at 176,055.

Exelis argues that it was reasonable for it to conclude that its TSR compensation costs were allowable under FAR 31.205-6(i) because the government purportedly changed its position regarding whether the TSR compensation costs were allowable under FAR 31.205-6(i). In particular, Exelis argues that:

13

(1)    In the 2006 and 2007 audits, the DCAA took the position that the TSR compensation costs were allowable under FAR 31.205-6(i);

(2)    In the 31 July 2007 email, CACO Rivera took the position that the TSR compensation costs were unallowable under FAR 31.205-6(i);

(3)    In the 7 August 2008 email, CACO Rivera took the position that the TSR compensation costs were allowable under FAR 31.205-6(i); and

(4)    In the 2011 audit, the DCAA took the position that the TSR compensation costs were unallowable under FAR 31.205-6(i).

(App. br. at 9-10, 27) However, extrinsic evidence of an "internal debate amongst government personnel with respect to the allowability of these costs...cannot trump the plain language of the cost principle." *Raytheon Co.*, 15-1 BCA ¶ 36,043 at 176,055; *see also Technology Systems, Inc.*, ASBCA No. 59577, 17-1 BCA ¶ 36,631 at 178,387-88 (holding that the government's failure to challenge a cost in a prior audit does not preclude it from doing so).

Exelis attempts to distinguish *Raytheon* by arguing that, unlike in *Raytheon*, the government's communication of its purportedly changing position created a reasonable belief on Exelis's part that its TSR compensation costs were allowable. However, Exelis is incorrect that the government's position changed. The 2006 and 2007 audits did not even address the issue of whether Exelis's TSR compensation costs were allowable under FAR 31.205-6(i), let alone determine that such costs were allowable under that cost principle (findings 10-11). Indeed, Exelis did not present any evidence to the DCAA prior to those audits describing how it calculated TSR (*id.*). Therefore, Exelis improperly conflates silence on an issue that was not even raised by the evidence before an auditor with an affirmative finding of allowability.

While CACO Rivera's 31 July 2007 email suggested that Exelis's TSR compensation costs are unallowable under FAR 31.205-6(i) (finding 16), her 7 August 2008 email did not take a contrary position (finding 20). Rather, the 7 August 2008 email merely stated that CACO Rivera thought it was more appropriate to analyze whether the TSR compensation costs were allowable under a different cost principle–namely FAR 31.205-6(p) (*id.*). That does not constitute a determination that the TSR compensation costs were allowable under FAR 31.205-6(i). Thus, once presented with the issue, the government's position consistently has been that Exelis's TSR compensation costs are unallowable under FAR 31.205-6(i).

Even if the 7 August 2008 email could be read as a determination that Exelis's TSR compensation costs are allowable under FAR 31.205-6(i), that would not establish that it was reasonable under all the circumstances for a person in Exelis's position to conclude that the TSR compensation costs were allowable under

14

FAR 31.205-6(i). Exelis did not receive the 7 August 2008 email until after it submitted its 2006 indirect cost proposal on 20 July 2007 (findings 13, 20). Because Exelis did not have actual knowledge of CACO Rivera's purported position that the TSR compensation costs were allowable when it submitted the 2006 indirect cost proposal, it could not have relied upon that purported position in determining whether to include the costs in its 2006 indirect cost proposal. *Joseph T. Yamin*, ASBCA No. 35373, 90-2 BCA ¶ 22,657 at 113,837.

Exelis also argues that it was reasonable under all the circumstances for a person in Exelis's position to conclude that the TSR compensation costs were allowable under FAR 31.205-6(i) because other contractors also concluded that similar costs were allowable. While some contractors may have concluded that costs similar to Exelis's TSR compensation costs were allowable, more contractors reached the opposite conclusion (finding 33). In any event, such extrinsic evidence cannot trump the plain language of the cost principle. *Raytheon Co.*, 15-1 BCA ¶ 36,043 at 176,056. The fact that some contractors may have shared Exelis's belief says nothing about the reasonableness of that belief. In particular, the other contractor settlement does not help Exelis because the other contractor settlement indicated that the parties were not agreeing on the allowability or unallowability of any costs, and the other contractor stopped including TSR compensation costs in its cost submissions (finding 33).

B.   *Exelis Included the TSR Compensation and Entertainment Costs as Part of a Final Indirect Cost Rate Proposal*

Exelis included the TSR compensation and entertainment costs as part of a final indirect cost rate proposal. A final indirect cost rate proposal that triggers a penalty is a "final indirect cost rate proposal submitted by the Contractor after the expiration of its fiscal year which (i) [r]elates to any payment made on the basis of billing rates; or (ii) [w]ill be used in negotiating the final contract price." FAR 52.242-3(a). The contractor must certify its final indirect cost rate proposal. FAR 52.242-4.

Here, the 2006 indirect cost proposal that included Exelis's TSR compensation and entertainment costs was part of a final indirect cost rate proposal. The 2006 indirect cost proposal was to be used in negotiating the final contract price. The 2006 indirect cost proposal expressly certified that its purpose was to "establish a final indirect cost allocation" (finding 14). It also certified all the costs included in the 2006 indirect cost proposal were allowable in accordance with the FAR, and that none of the costs were unallowable (*id.*).

Exelis seeks to avoid the language of its certification by attempting to draw a distinction between a final indirect cost allocation proposal—which is how it characterizes the 2006 indirect cost proposal—and a final indirect cost rate proposal under FAR 52.216-7—which triggers the penalty provision. That purported distinction is unpersuasive in light of the record evidence. The cover letter to Exelis's 2006 indirect cost proposal expressly stated that "[t]his submission represents [Exelis]'s final

15

<u>indirect cost proposal</u> for our corporate office" (finding 13 (emphasis added)). Moreover, the cover letter expressly provided that Exelis was submitting the 2006 indirect cost proposal "[i]n accordance with FAR 52.216-7(d)(2)(i)" (*id.*), which requires the submission of a "final indirect cost rate proposal." FAR 52.216-7(d)(2)(i).

Moreover, at the time that Exelis certified its 2006 indirect cost proposal on 20 July 2007 (finding 13), it knew that the government was auditing its submissions regarding the allowability of the intermediate home office's compensation costs, and recommending penalties for the inclusion of unallowable costs in those submissions. By that time, Exelis had received the DCAA's 2006 and 2007 audits of its FY 2004 and FY 2005 indirect cost proposals (finding 12). However, Exelis never claimed in any of its objections to the audits that the 2006 indirect cost proposal—or other submissions allocating the intermediate home office's executive compensation—were exempt from penalty as non-final indirect cost rate proposals (findings 12, 25, 29, 31). In fact, it paid a penalty on such a submission (finding 23). Thus, the evidence shows that—notwithstanding its current characterization—Exelis understood at the time of submission that its 2006 indirect cost proposal was part of its final indirect cost rate proposal, which could trigger the penalty provision.

### C. *The Contracting Officer Did Not Have to Waive the Penalty for the Entertainment Costs*

The contracting officer did not have to waive the penalty for the entertainment costs. A contracting officer must waive a penalty where "[t]he amount of the unallowable costs under the proposal which are subject to the penalty is $10,000 or less." FAR 42.709-5(b). The contracting officer also must waive a penalty where:

> The contractor demonstrates, to the cognizant contracting officer's satisfaction, that —
>
> (1) It has established policies and personnel training and an internal control and review system that provide assurance that unallowable costs subject to penalties are precluded from being included in the contractor's final indirect cost rate proposals...; and
>
> (2) The unallowable costs subject to the penalty were inadvertently incorporated into the proposal; *i.e.*, their inclusion resulted from an unintentional error, notwithstanding the exercise of due care.

FAR 42.709-5(c).

Here, neither subsection applies. Exelis argues that the contracting officer was required to waive the penalty for the entertainment costs under FAR 42.709-5(b) because the

16

expressly unallowable costs only were $7,050. However, the proper measure of the amount of the expressly unallowable costs under FAR 42.709-5(b) is the "total expressly unallowable costs," not a particular category of unallowable costs. *Thomas Associates, Inc.*, ASBCA No. 57126, 12-2 BCA ¶ 35,162 at 172,551. In this case, the total expressly unallowable costs included both the TSR compensation and entertainment costs, which totaled $3,635,322 (findings 46-47). Because the total expressly unallowable costs were greater than $10,000, FAR 42.709-5(b) did not require the government to waive the penalty.

Nor did FAR 42.709-5(c) require the government to waive the penalty for the entertainment costs. It is undisputed that Exelis did not submit to CACO Rivera any evidence that it had established policies, personnel training, and an internal control and review system that provided assurance that environmental costs were precluded from being included in final indirect cost rate proposals (finding 38).

Exelis argues that it was not required to submit such evidence to CACO Rivera, and that it instead can submit such evidence to the Board in the first instance. However, the "to the cognizant contracting officer's satisfaction" language of FAR 42.709-5(c) strongly suggests that a contractor must provide evidence to the contracting officer.

Even if that were not the case, the evidence that Exelis submits to the Board does not show that it had established policies, personnel training, and an internal control and review system that provided assurance that entertainment costs were precluded from being included in final indirect cost rate proposals. The evidence upon which Exelis primarily relies—namely its corporate policies—did not become effective until 31 October 2011, well after it submitted the 2006 indirect cost proposal on 20 July 2007 (findings 13, 39). Likewise, the ethics and compliance standard, and the 2011 survey were not issued until after the 2006 indirect cost proposal submission (findings 40, 44). Therefore, those documents do not show that, at the time it included the entertainment costs in the 2006 indirect cost proposal, Exelis had established policies, personnel training, and an internal control and review system that provided assurance that entertainment costs were precluded from being included in final indirect cost rate proposals.

The other documents submitted by Exelis—namely its code of corporate conduct, presentation on allowability and allocability of home office G&A expenses, and its presentation on current developments in government contracting—pre-date the 2006 indirect cost proposal. However, those documents are general in nature, and do not show that Exelis had established policies, personnel training, and an internal control and review system that provided assurance that entertainment costs were precluded from being included in final indirect cost rate proposals. (Findings 41-43)

In sum, the contracting officer was not required to waive the penalty.

## CONCLUSION

We deny the appeal.

Dated: 29 March 2017

JAMES R. SWEET
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 58966, Appeal of Exelis Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

18